UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RICHARD LYNCH,

                    Plaintiff,

-against-

CITY OF NEW YORK, et al.,

                    Defendants.

---

No. 16-CV-7355 (LAP)

<u>MEMORANDUM & ORDER</u>

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court is the motion filed by Defendant City of New York ("the City") to: (1) quash the deposition subpoena for the non-party dismissed defendant Agency Attorney Lester Paverman's ("Paverman") deposition, or (2) grant a protective order limiting the scope of Paverman's deposition to questioning pertaining to the underlying incident on June 22, 2015, as alleged in the Amended Complaint.  (<u>See</u> dkt. no. 81 ("Mot."); <u>see also</u> dkt. no. 88 ("Reply").)  Plaintiff Richard Lynch opposes the motion.  (<u>See</u> dkt. no. 84 ("Opp.").)  For the reasons below, the motion to quash is <u>DENIED</u>, and the motion for a protective order is <u>GRANTED</u>.

## I.  <u>Background</u>

    Because the Court has already detailed the facts underlying this action, <u>see</u> <u>Lynch v. City of New York</u>, No. 16-CV-7355, 2018 WL 1750078 at *1–4 (S.D.N.Y. Mar. 27, 2018), <u>aff'd in part</u>,

vacated in part, 952 F.3d 67 (2d Cir. 2020), the Court will summarize only the facts relevant to the instant motion here.

The parties have exchanged communications over a span of months regarding a possible deposition of Paverman.  (See dkt. no. 84 at 1-2.)  Unable to agree on whether Paverman would be deposed voluntarily, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff served a subpoena for Paverman's deposition on February 5, 2021.  (See dkt. no. 81 at 2.)  The deposition was to be held on March 25, 2021.  (See id.)

Paverman is a dismissed defendant to this suit.  (See dkt. no. 49.)  Plaintiff alleged that NYPD Legal Bureau attorneys have "exclusively (or almost exclusively)" exercised their authority to prosecute violation-level cases "against demonstrators, and particularly those demonstrators associated with the Black Lives Matter movement."  (Id. at 9.)  Plaintiffs alleged that "there is a significant history of NYPD Legal Bureau Attorneys assisting arresting officers to construct false narratives concerning what they allegedly 'personally observed' in the context of demonstration-related arrests."  (Id. at 12-13 (quoting dkt. no. 18 at ¶ 46.))  However, "Plaintiffs provide[d] no factual allegations to support the assertion that Paverman constructed false narratives."  (Id. at 13.)  Nor did Plaintiffs provide a factual basis to support the allegation "that Paverman 'colluded' with [dismissed defendant Jonmichael] Delarosa"

("Delarosa") regarding dismissed plaintiff Vienna Rye's ("Rye")
arrest.  (Id. at 12.)  Thus, the claims against Paverman were
dismissed "for failure to plead sufficient facts and state a
claim that is plausible on its face."  (Id. at 13 (citing Bell
Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fed.
R. Civ. P. 12(b)(6), 12(c).

    This Court bifurcated discovery and trial of the claims
against the City from those against the individual defendants.
(See dkt. no. 65.)  The principles of judicial economy justify
such bifurcation, "since there is no finding of Monell liability
without first finding a constitutional violation."  (Id. at 8
(citing Brown v. City of New York, No. 13-cv-6912, 2016 WL
616396 at *2 (S.D.N.Y. Feb. 16,2016)).)  The expensive and time-
consuming discovery on Monell claims will "all be for naught if
Plaintiff fails to prove an underlying constitutional
violation."  (Id. at 8-9.)

    The City moves to quash the deposition subpoena on four
grounds, namely that: (1) the subpoena seeks privileged
material, (2) the subpoena seeks information that is irrelevant
to Plaintiff's claims or duplicative of other discovery,
(3) Paverman has no recollection regarding the June 22, 2015
incident, and (4) the subpoena represents an "undue burden" on a
non-party.  (See dkt. nos. 81, 88.)  Alternatively, the City
seeks an advance protective order to limit the scope of the

Paverman deposition in light of privilege concerns and the
Monell bifurcation previously ordered by this Court.  (Id.)

## II.  <u>Legal Standards</u>

A) <u>Motion to Quash</u>

It is fundamental to civil litigation that "[p]arties may
obtain discovery regarding any nonprivileged matter that is
relevant to any party's claim or defense and proportional to the
needs of the case."  Fed. R. Civ. P. 26(b)(1).  The burden of
relevance falls squarely on the party seeking discovery.  <u>See</u>
<u>Cohen v. City of New York</u>, No. 05-cv-6780, 2010 U.S. Dist. LEXIS
44762 at *6 (S.D.N.Y. May 6, 2010).  However, a court "must
limit the frequency or extent of discovery otherwise allowed" if
"the discovery sought is unreasonably cumulative or duplicative,
or can be obtained from some other source that is more
convenient, less burdensome, or less expensive" or "the proposed
discovery is outside the scope permitted by Rule 26(b)(1)."  <u>Id.</u>
26(b)(2)(C).  In this determination, the court may give "special
weight" to non-party status when considering a party's burden of
production.  <u>See</u> <u>Cohen</u>, 2010 U.S. Dist. LEXIS 44762 at *7.

Similarly, a court must quash a subpoena that "requires
disclosure of privileged or other protected matter, if no
exception or waiver applies" or if the subpoena "subjects a
person to undue burden."  Fed. R. Civ. P.  45(d)(3)(A)(iii)-
(iv).  Ultimately, "[m]otions to compel and motions to quash a

subpoena are both 'entrusted to the sound discretion of the district court.'"  In re Fitch, Inc., 330 F.3d 104, 108 (2d Cir. 2003) (quoting United States v. Sanders, 211 F.3d 711, 720 (2d Cir. 2000)).

B) Motion for a Protective Order

A party or any person from whom discovery is sought may move for a protective order -- and the court may issue such an order -- "for good cause, . . . protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).  The party requesting the protective order bears the burden of demonstrating "that good cause exists for issuance of that order."  Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 (2d Cir. 2004) (quoting In re "Agent Orange" Prod. Liab. Litig., 821 F.2d 139, 145 (1987)); see also Fed. R. Civ. P. 26(b)(2)(B) ("On motion [] for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.").

Because of the "significant potential for abuse" in pretrial discovery by depositions, "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34, 36 (1984).  Explicitly enumerated as types of protective orders are orders

that "forbid[] inquiry into certain matters" or that "limit[]
the scope of disclosure or discovery to certain matters."  Fed.
R. Civ. P. 26(c)(1)(D).

C) Attorney-Client Privilege

   The attorney-client privilege is "the oldest of privileges for
confidential communications" and designed "to encourage full and
frank communication between attorneys and their clients and
thereby promote broader public interests in the observance of
law and administration of justice."  Upjohn Co. v. United
States, 449 U.S. 383, 389 (1981).  This privilege "exists to
protect not only the giving of professional advice to those who
can act on it but also the giving of information to the lawyer
to enable him to give sound and informed advice."  Id. (citing
Trammel v. United States, 445 U.S. 40, 51 (1980); Fisher v.
United States, 425 U.S. 391, 403 (1976)).  This is because
"[t]he first step in the resolution of any legal problem is
ascertaining the factual background and sifting through the
facts with an eye to the legally relevant."  Id. at 390-91
(citing ABA Code of Professional Responsibility, Ethical
Consideration 4-1; Hickman v. Taylor, 329 U.S. 495, 511 (1947)).

   It has been acknowledged that the existence of the attorney-
client privilege is not without shortcomings.  Any privilege is
an "exception[] to the demand for every man's evidence. . . in
derogation of the search for the truth."  United States v.

<u>Nixon</u>, 418 U.S. 683, 710 (1974).  For the attorney-client

privilege specifically:

> [t]he idea that a robust attorney-client privilege will
> in fact "promote broader public interests" does not mean
> that application of the privilege will render justice in
> every single case.  Nevertheless, courts have by reason
> and experience concluded that a consistent application
> of the privilege over time is necessary to promote the
> rule of law by encouraging consultation with lawyers,
> and ensuring that lawyers, once consulted, are able to
> render to their clients fully informed legal advice.

<u>In re Grand Jury Investigation</u>, 399 F.3d 527, 531 (2d Cir. 2005)

(citing Restatement (Third) of the Law Governing Lawyers § 68

cmt. c (2000)).

Government attorneys may invoke the attorney-client

privilege, and the burden rests on the government as the

invoking party to establish the privilege.  Attorney-client

privilege applies equally in the private context as when the

attorney is a government attorney.  <u>See</u> <u>In re County of Erie</u>,

473 F.3d 413, 419 (2d Cir. 2007) ("[I]n civil litigation between

a government agency and privilege litigants, the government's

claim to the protections of the attorney-client privilege is on

a par with the claim of an individual or a corporate entity.").

To claim the attorney-client privilege, the invoking party must

show: "(1) a communication between client and counsel that

(2) was intended to be and was in fact kept confidential, and

(3) was made for the purpose of obtaining or providing legal

advice." Id. (citing United States v. Constr. Prods. Rsch.,
Inc., 73 F.3d 464, 473 (2d Cir. 1996)).

D) Work-Product Privilege

The work product privilege, protects "all written materials
obtained or prepared by an adversary's counsel" prepared by an
attorney "with an eye toward litigation." Upjohn, 449 U.S. at
399 (quoting Hickman, 329 U.S. at 511); see also Fed. R. Civ. P.
26(b)(3)(A).  Work product can come in many forms: "in
interviews, statements, memoranda, correspondence, briefs,
mental impressions, personal beliefs, and countless other
tangible and intangible ways." United States v. Nobles, 422
U.S. 225, 237 (1975) (quoting Hickman, 329 U.S. at 511).
Production of this kind of material is "particularly disfavored
because it tends to reveal the attorney's mental processes."
Upjohn, 449 U.S. at 399; see also Nobles, 422 U.S. at 237
("Proper preparation of a client's case demands that [the
attorney] assemble information, sift what he considers to be the
relevant from the irrelevant facts, prepare his legal theories
and plan his strategy without undue and needless
interference.").

However, attorney work product can be differentiated -- for
the purposes of work product privilege -- into two categories
with varying degrees of protection: fact work product and
opinion work product.  See Fed. R. Civ. P. 26(b)(3)(B); see also

8

FTC v. Boehringer, 778 F.3d 142, 151 (D.C. Cir. 2015) ("Rule 26 distinguishes between opinion work product, which reveals 'the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation,' and fact work product, which does not."); see also Grand Jury Subpoena v. United States, 870 F.3d 312, 316 (4th Cir. 2017) ("[F]act work product is a 'transaction of the factual events involved.'").

**III.  Discussion**

A) The subpoena was properly issued.

The deposition sought is "relevant" and "proportional to the needs of the case;" therefore, the subpoena was properly issued.  Fed. R. Civ. P. 26(b)(1).  "[D]eposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials."  Herbert v. Lando, 441 U.S. 153, 177 (1979) (citing Schlagenhauf v. Holder, 379 U.S. 104, 114-15 (1964); Hickman, 329 U.S. at 501, 507).  Nonetheless, "the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied."  Id.  The standard for relevance "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  Goodloe v. City of New York, 136 F.

Supp. 3d 283, 292 (E.D.N.Y. 2015) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

Plaintiff has demonstrated an interest in: (1) whether Paverman "rendered advice to the arresting officers at this particular demonstration" wherein Plaintiff was arrested, (2) Paverman's "normal practices as to how he advises arresting officers at demonstrations," and (3) "the issuance of the [allegedly] perjured summonses" that pertained to Plaintiff. (Dkt. no. 84 at 5-6.)  The City has indicated concern that, if deposed, Plaintiff will question Paverman on the following topics: (1) "the June 22, 2015 incident" generally, (2) the alleged provision of "legal advice or consultation to Defendant [Mariann] Mandy," ("Mandy") (3) "the criminal court summonses plaintiff was issued," and (4) "whether [Paverman] was at the precinct where the arrests were processed or at 1 Police Plaza that day."  (Dkt. no. 81 at 3.)  The Court addresses the relevancy and privileged nature of each topic in turn.

First, Paverman's location during his working hours as an attorney on June 22, 2015 is relevant, non-privileged information.  The fact of an attorney's location on a particular day or the location of a discussion rendering legal advice will rarely implicate the attorney-client privilege or the work product privilege.  See, e.g., United States v. Pappadio, 346 F.2d 5, 7, 9 (1965) (upholding criminal contempt conviction

after the defendant refused to answer, "Where did the meetings
[with the attorneys] take place?" despite the Court's denial of
the privilege claim over the answer).

Second, whether Paverman rendered legal advice related to
Plaintiff's arrest on June 22, 2015, is relevant, non-privileged
information.  The "fact of legal consultation" is generally not
privileged under the attorney-client privilege, or any other
privilege.  See, e.g., In re Grand Jury Subpoena Served Upon
Doe, 781 F.2d 238, 247-48 (2d Cir. 1986) ("While consultation
with an attorney, and payment of a fee, may be necessary to
obtain legal advice, their disclosure does not inhibit the
ordinary communication necessary for an attorney to act
effectively, justly, and expeditiously."); H.W. Carter & Sons v.
William Carter Co., 1995 U.S. Dist. LEXIS 6578 at *7 (S.D.N.Y.
May 16, 1995) ("The attorney-client privilege does not extend to
facts pertaining to the existence of an attorney-client
relationship, the fact of consultation, or the dates and general
nature of legal services performed.").  The exceptions to this
general rule are narrowly construed and limited to cases wherein
revealing the fact of consultation or the identity of the client
alone would be "tantamount" to revealing the communication
itself.  See, e.g., Vingelli v United States, 992 F.2d 449, 452-
53 (2d Cir. 1993).  The circumstances at hand are not
exceptional in this way, and Paverman's disclosure of whether he

11

rendered legal advice on June 22, 2015 in relation to the issuance of Plaintiff's summons will not "incapacitate" him from rendering legal advice in the future.  Id. at 452.

Third, Paverman's "normal practices" as an attorney are also relevant, non-privileged information.  As the District Court for the District of Columbia stated in a case related to the Special Counsel's investigation into Russian election interference, an attorney's "normal practices" -- such as whether it was "the [attorney-deposee]'s practice to review with her clients written submissions before sending them to the [DOJ]" -- was only "general information" that did "not fall within the scope of any privilege."  In re Grand Jury Investigation, No.17-cr-2336, 2017 U.S. Dist. LEXIS 186420 at *30-31 (D.D.C. Oct. 2, 2017).  Thus, Paverman's "normal practices" encompasses the scope of his normal job responsibilities and generally how he renders advice to arresting officers.  "Normal practices" do not, however, encompass Paverman's practices on specific dates or at specific demonstrations.

Fourth, inquiries related the criminal summons issued to Plaintiff may be relevant, non-privileged information depending on the precise line of inquiry.  Because the fact of a consultation is not privileged, as stated above, Paverman may be asked if he rendered legal advice in connection with the issuance of a summons to Plaintiff.  Further, questions such as

"do you recognize this document?" and "why do you recognize this document?" are plainly permissible because they do not implicate a privilege.  However, questions similar to what Plaintiff's counsel asked Delarosa, <u>see</u> dkt. no. 84 at 3, such as "did you advise the defendant to use this phrasing in the summons?", seek information regarding Paverman's legal advice -- if in fact any occurred -- and are thus impermissible.

These four lines of inquiries alone establish that the subpoena is relevant, is not "unreasonably cumulative or duplicative," and there is no other source from which this material can be sought that is "more convenient, less burdensome, or less expensive," Fed. R. Civ. P. 26(b)(2)(C)(i), because Paverman is the sole source of knowledge of at least (1) his own "normal practices," and (2) his location throughout the day of June 22, 2015.

B) <u>No grounds exist upon which to grant the motion to quash the subpoena.</u>

The City appears to present four arguments as to why this Court should quash the deposition subpoena: (1) the subpoena seeks privileged material; (2) the subpoena seeks information that is irrelevant to Plaintiff's claims or duplicative of other discovery; (3) Paverman has no recollection regarding the June 22, 2015 incident; and (4) the subpoena represents an "undue burden" on a non-party.  (<u>See</u> dkt. nos. 81, 88.)

13

First, because privileged material is outside of the valid scope of the subpoena, the subpoena may not be quashed on the basis that it "requires disclosure of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii). The protective order granted today also alleviates these concerns. See infra Section III(C).

Second, lack of memory is generally "an insufficient basis on which to quash the deposition subpoena." City of Almaty v. Sater, No. 19-cv-2645, 2020 U.S. Dist. LEXIS 93694 at *9 (S.D.N.Y. May 28, 2020); see also SEC v. Tourre, No. 10-cv-3229, 2013 U.S. Dist. LEXIS 206324 at *3 (S.D.N.Y. June 26, 2013) (holding that a subpoena would be enforced over the non-party's claim that he had "no independent recollection" of the call at issue given the importance of the potential testimony). The City stated that "Paverman has no recollection of the June 22, 2015 incident and, accordingly, has no substantive testimony to offer concerning the allegations." (Dkt. no. 81 at 3.) However, Plaintiff is entitled to ask Paverman questions "relevant to any [] claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). As established above, at least some of Plaintiff's questions relate to relevant, non-privileged content. Paverman's lack of memory regarding the June 22, 2015 incident does not negate the relevancy of Plaintiff's non-privileged questions. If Paverman

14

does not know or recall any information with which to answer the
question, he can simply say so during the deposition.

Third, the subpoena does not subject Paverman to an undue
burden -- even granting special weight to Paverman's non-party
status -- and thus cannot be quashed on that basis.  Non-parties
are not immune from discovery obligations.  See Seattle Times
Co., 467 U.S. at 35 ("Nor do[es] [Rule 26] apply only to parties
to the litigation, as relevant information in the hands of third
parties may be subject to discovery.").  Although special weight
may be given to an individual's status as a non-party, it is not
determinative.  See, e.g., Cohen v. City of New York, No. 05-cv-
6780, 2010 U.S. Dist. LEXIS 44762 at *7-8 (S.D.N.Y. May 6,
2010); City of Almaty, 2020 U.S. Dist. LEXIS 93694 at *7-10
(denying a motion to quash a non-party deposition subpoena
despite the non-party's limited recollections and concerns about
an in-person deposition in the middle of the COVID-19 pandemic).
Paverman is a current employee of the City, which is a party,
and, to this Court's knowledge, present and available in New
York City.  If indeed Paverman has a limited recollection of the
events of June 22, 2015, then his time required to prepare for
the deposition will be limited, as will the time required to
complete the deposition itself.

In sum, no valid grounds exist upon which to quash the
subpoena.

C) "Good cause" exists to issue a protective order to prevent
   inquiry into certain subject matters.

     The City asks this Court to issue a protective order
precluding inquiry "into subject matter that is protected by the
attorney-client and work product privileges and/or that is
premature in light of the bifurcation of municipal discovery."
(Dkt. no. 81 at 1.)  It is well established that "judges should
not hesitate to exercise appropriate control over the discovery
process." Herbert v. Lando, 441 U.S. 153, 177 (1979).  Due to
the concerns this Court has, based upon the Plaintiff's
demonstrated interest in questioning Paverman regarding the
rendering of legal advice and interest in pursuing discovery on
the bifurcated Monell claim, this Court issues a protective
order prohibiting any inquiry during Paverman's deposition into
any subject matter:

- Protected by the attorney-client privilege;

- Protected by the work product privilege; or

- Premature considering this Court's order bifurcating Monell
  discovery.

The contours of this protective order are explained below.

  i.  The attorney-client privilege protects the substance of
      any legal advice rendered by Paverman to the arresting
      officers.

     The attorney-client privilege is implicated by legal
communications between Paverman and Mandy as well as Paverman

and the dismissed defendants Delarosa and Andrew Lombardo

("Lombardo").  The City has claimed attorney-client privilege

over "[a]ny legal advice Paverman may have provided to officers

regarding other arrests."  (Dkt. no. 81 at 3.)  In contrast,

Plaintiff argues that the attorney-client privilege "cannot

apply in the context of an arresting officer's discussions

concerning how to process his or her arrest and what to charge

the arrestee with."  (Dkt. no. 84 at 4.)  It is true that "[t]he

NYPD Legal Bureau serves as the NYPD's 'in-house' counsel,

advising the Commissioner and members of the NYPD on legal

issues affecting the Department."  Macnamara v. City of New

York, 2008 U.S. Dist. LEXIS 3937 at *2 (S.D.N.Y. Jan. 17, 2008).

Further, when the "client" is an entity rather than a person, no

employee of the entity falls outside of the ambit of attorney-

client privilege when consulting in-house counsel for legal

advice within the scope of their employment.  Upjohn, 449 U.S.

at 395-98.  This alone does not mean, however, that all

communications between Legal Bureau personnel and members of the

NYPD are attorney-client privileged.

    In the government context, the Court of Appeals for the

Second Circuit has likened distinguishing between legal advice

and policy advice to the application of attorney-client

privilege in the corporate context: business communications by

in-house counsel are not protected under the privilege whereas

communications "generated for the purpose of obtaining or providing legal assistance" are protected.  In re County of Erie, 473 F.3d at 419.  The Court of Appeals also clarified that "[f]undamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct."  Id.  Thus, passing remarks made by an officer to a Legal Bureau attorney not designed to seek legal advice are not protected: e.g., "I arrested a man last week who was wearing the most interesting graphic t-shirt.  You'll never believe what the punchline on the back said."  However, an arresting officer consulting a Legal Bureau attorney regarding "what to charge the arrestee with" is a paradigmatic solicitation of legal advice: "based on what I observed, does probable cause support these charges?"  Accord Macnamara, 2008 U.S. Dist. LEXIS 3937 at *10-19 (rejecting the application of the crime-fraud exception to privileged conversations that occurred "between Legal Bureau representatives and arresting officers" at the location of a demonstration).

Finally, there are no facts alleged that would support a conclusion that there was no expectation of confidentiality in this rendering of legal advice.  There are no allegations of a "crowded elevator," "third-party participants," or a "recorded line" that would indicate that the expectation of privacy here was unreasonable.  See, e.g., United States v. Mejia, 655 F.3d

126, 132-34 (2d Cir. 2011) ("The question of whether the
privilege applies in this context continues to involve a
determination of whether the claimant asserting the privilege
treated the [communications] in question in such a careless
manner as to negate her [or his] intent to keep them
confidential." (internal quotation and citation omitted)
(alterations in original)).

In sum, barring a sufficient showing to vitiate the
privilege under the crime-fraud exception -- which this Court has
not found -- or the waiver of the attorney-client privilege by
the City, any legal discussions between Paverman and arresting
officers are protected under the attorney-client privilege, and
subject to this protective order.

ii. The work product privilege protects Paverman's
recollections of his legal discussions with arresting
officers, as well as any other tangible or intangible
work product in furtherance of his rendering of legal
advice.

The work product privilege is also implicated by Paverman's
legal communications with the aforementioned arresting officers
and protects the work product stemming from those legal
communications.  Even disregarding Mandy's status as a "client"
to whom the protections of the attorney-client privilege are
owed, if Paverman rendered legal advice in relation to
Plaintiff's summons and spoke to Mandy as a witness to the
conduct, then Paverman's recollections of such conversation are

protected under the work product doctrine.  The Court in Hickman held that there is "no practice more demoralizing [] than to require a lawyer to write out and deliver to his adversary an account of what witnesses have told him.  Even if his recollection were perfect, the statement would be his language, permeated with his inferences." 329 U.S. at 516-17.  For a variety of policy considerations, not least among them complications regarding credibility and impeachment, the Supreme Court's solution in Hickman was requiring opposing counsel to interview the witnesses themselves.  Id. at 518 ("Having been supplied the names of the witnesses, petitioner's lawyer gives no reason why he cannot interview them himself.").  This, Plaintiff has ostensibly done: Defendant Mandy was deposed by Plaintiff on May 19, 2021.  (See dkt. no. 91 at 1.)

Thus, to ask Paverman the question "What did Defendant Mandy tell you on June 22, 2015?" constitutes at minimum "mental impressions" and recollections protected under the work product privilege.  This protection is independent of and concurrent to the protections provided to the substance of the legal advice by attorney-client privilege.  Courts are split, however, on whether such question constitutes fact work product or opinion work product.  Compare In re Grand Jury Investigation, 2017 U.S. Dist. LEXIS 186420 at *37-39 (D.D.C. Oct. 2, 2017) (fact work product), with In re Grand Jury Subpoena, 870 F.3d at 319

(opinion work product).  Regardless, to overcome even the lesser
protections shielding fact work product, Plaintiff must make a
showing of "a substantial need for the materials and that it
cannot obtain the equivalent information by other means without
undue hardship."  Greater N.Y. Taxi Ass'n v. City of New York,
2017 U.S. Dist. LEXIS 146655 at *38 (S.D.N.Y. Sept. 11, 2017)
(citing In re Grand Jury Proceedings, 219 F.3d 175, 190 (2d Cir.
2000)); see also Fed. R. Civ. P. 26(b)(3)).  Such a showing is
not present here because a "substantial need" has not been
established.  Because the facts underlying the summons can just
as easily be obtained through depositions of the arresting
officers, there is no substantial need to vitiate the work
product privilege to obtain those same facts filtered through
Paverman's legal perspective and his memory.

Other forms of attorney work product -- including but not
limited to "memoranda, correspondence, [and] briefs" prepared in
connection with the rendering of the legal advice -- are also
protected under the work product privilege.  Nobles, 422 U.S. at
237 (quoting Hickman, 329 U.S. at 511).  The appropriate inquiry
into whether Paverman rendered legal advice to Mandy on June 22,
2015 does not extend to whether Paverman took any notes in
furtherance of his rendering of legal advice on that day, or the
contents of those notes -- if any exist.  Both the existence and
content of such notes would be protected information under the

opinion work product doctrine.  See In re Grand Jury
Investigation, 2017 U.S. Dist. LEXIS 186420 at *42 ("The fact
that an attorney memorialized, in writing or another form,
particular client communications reveals her 'thought
processes.'" (quoting In re Grand Jury Subpoena, 870 F.3d at
322)); see also supra Section II(D).

  iii.  The attorney-client privilege does not protect disclosure
        of the facts underlying the charges contained in the
        summonses from the arresting officer.

     "The [attorney-client] privilege only protects disclosure
of communications; it does not protect disclosure of the
underlying facts by those who communicated with the attorney."
Upjohn, 449 U.S. at 395 (citing Philadelphia v. Westinghouse
Elec. Corp., 205 F. Supp. 830, 831 (E.D. Pa. 1962)).  Thus,
disclosure of the facts underlying the charges contained in the
summons from the arresting officer is not privileged under the
attorney-client privilege, even if that individual relayed the
same facts to Paverman in his role as an attorney.  Further,
Mandy's recollections regarding the facts of the arrest are not
protected under the work product privilege, because Mandy is not
an attorney and thus Mandy's recollections do not "reveal the
attorney's mental processes."  Upjohn, 449 U.S. at 399.  It is
this Court's understanding that Mandy was deposed by Plaintiffs
on May 19, 2021. (See dkt. no. 91 at 1.)  She is the proper

target for any inquiry related to the underlying facts of the summons.

Plaintiff argues that Paverman may be compelled to disclose the underlying facts allegedly relayed to him by Mandy as Rosario material.  (Dkt. no. 84 at 5.)  Rosario, and its federal equivalent Brady, only apply in the criminal context.  See Brady v. Maryland, 373 U.S. 83 (1963); People v. Rosario, 9 N.Y.2d 286 (1961).  As this is a civil case, those precedents do not determine whether material -- privileged or not -- must be disclosed between the parties.

> iv.  There is insufficient evidence to vitiate either the attorney-client privilege or the work product privilege through the crime-fraud exception.

Plaintiff contends that "to the extent that there is any attorney-client privilege in connection with communications between Legal Bureau attorneys and arresting officers concerning the arresting officers' sworn allegations against their arrestees," the facts of this case merit vitiation of the privilege under the crime-fraud exception.  (Dkt. no. 84 at 6.) However, no waiver or exception to privilege has been sufficiently established such that Plaintiff may seek material otherwise protected by either the attorney-client privilege or the work product privilege.

In the Second Circuit, "[t]he crime-fraud exception applies [to vitiate privilege] when there is probable cause to believe

that: (1) a fraud or crime has been committed; and (2) the communication in question was intended to further the fraud or crime." Doe v. United States, 82 F. App'x 250, 252 (2d Cir. 2003) (citing United States v. Jacobs, 117 F.3d 82, 87-88 (2d Cir. 1997)); see also In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) ("The crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud."). The facts at hand -- the similarities of the wording of the Rye summons and the Lynch summons, the fact that Paverman consulted on the issuance of the Rye summons, and the allegation of "False Observation" practices -- do not meet the high threshold of particularized probable cause, much less a "reasonable basis." See, e.g., MacNamara v. City of New York, No. 04-cv-9216, 2007 U.S. Dist. LEXIS 17478 at *26-28 (S.D.N.Y. Mar. 14, 2007) (rejecting the application of the crime-fraud exception in a case alleging systemic false arrest by the NYPD during demonstrations); MacNamara v. City of New York, 2007 U.S. Dist. LEXIS 79870 at *8-9 (S.D.N.Y. Oct. 30, 2007) (rejecting, for a second time, the application of the crime-fraud exception for failure "to link particular communications with specific examples of false reporting by arresting officers"); Coan v. Dunne, No. 15-cv-50, 2019 U.S. Dist. LEXIS 60125 at *9 (D. Conn. Apr. 8, 2019) (advocating for protection of the privileges where the "claim of crime or fraud

appears to turn on circumstantial and highly contestable inferences to be drawn from a complex document trail.").

> v. No inquiry may infringe on this Court's previously issued Order bifurcating discovery on the <u>Monell</u> claims.

This Court previously ordered the bifurcation of the <u>Monell</u> claims against the City from those against the individual defendants. (<u>See</u> dkt. no. 65.) The permissible scope of the deposition subpoena issued to Paverman does not infringe upon the scope of the <u>Monell</u> bifurcation order. For example, questions about Paverman's "normal practices" may not be extended to questions about the City's "normal practices" regarding demonstrations.

D) <u>Plaintiff's implied motion for reconsideration is denied.</u>

Finally, Plaintiff asks the Court both to vacate the prior order bifurcating <u>Monell</u> discovery and to vacate its prior order denying Plaintiff leave to file a Second Amended Complaint. (<u>See</u> dkt. nos. 65, 84 at 6.) Such a request constitutes reconsideration, and Plaintiff has not made a sufficient showing of: (1) "change of controlling law;" (2) "availability of new evidence;" or (3) "the need to correct a clear error or prevent manifest injustice." <u>Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.</u>, 729 F.3d 99, 104 (2d Cir. 2013) (internal quotation omitted). This is a "strict" standard, and reconsideration "is not a vehicle for relitigating old issues."

Analytical Survs., Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012).

Plaintiff argues that Delarosa's deposition has yielded new evidence that Delarosa was lying about the issuance of the summons. (See dkt. no. 84 at 3.) Delarosa affirmatively asserted that no one helped him choose the language on the summons and that the language "came from [his] own mind." (Id.) However, Plaintiff points to Delarosa's definition of one phrase used -- "to wit," as meaning "like the person understanding the knowledge" when used in a sentence -- and Delarosa's inability to "think of an example" of a sentence using that phrase as evidence that Delarosa's testimony regarding the language of the summons is "clearly a lie." (Id.)

To prevail on the grounds of the "availability of new evidence," the party seeking reconsideration must establish four prongs: "(1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching." Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc., 970 F.3d 133, 146-47 (2d Cir. 2020) (quoting United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001)).

Even if the Delarosa deposition fulfills the first two prongs, it fails the second two prongs.  Plaintiff's conclusions that the Delarosa deposition "demonstrated that Delarosa, contrary to his assertions, did not in fact come up with the allegations on the summons he issued" are just that: Plaintiff's conclusions interpreting the significance of the Delarosa deposition. However, the Delarosa deposition alone does not affect how the Court ruled on its prior order and does not meet the materiality threshold required for reconsideration of this Court's decision to abide by the Second Circuit's preference to bifurcate <u>Monell</u> claims.  (<u>See</u> dkt. no. 65.)  Any inquiry into other demonstrations and other arrests remains not presently relevant.

Accordingly, the Court declines to reconsider its order bifurcating <u>Monell</u> discovery and its order denying Plaintiff leave to file a Second Amended Complaint.

**IV.  <u>Conclusion</u>**

To the extent and for the reasons stated above, the motion to quash (dkt. no. 81) is <u>DENIED</u> and the motion for a protective order (dkt. no. 81) is <u>GRANTED</u> as detailed in Section III(C), above.  The Clerk of the Court shall close the open motions (dkt. no. 81).

**SO ORDERED.**

Dated:      November 4, 2021
            New York, New York

_Loretta A. Preska_

LORETTA A. PRESKA
Senior United States District Judge